311-0576, Jennifer Gregory, appellant to James Bonebrake, v. City of Peoria, appendix 7-1. Mr. Bonebrake? Good morning, Your Honor. Good morning. I'm James Bonebrake. I represent Jennifer Gregory, individually, as executor to the state of Stephen Michael Gregory, deceased, and as an ex-friend of her minor children, Michael Douglas Gregory and Richard Ivan Gregory. I know you've had a chance to review the briefs, but I wanted to go through some of what I consider to be crucial facts and elements of the action first. As you know, Michael Gregory was killed on June 26, 2004, in a car crash just off of Orange Prairie Road in Peoria, Illinois. At that time, he was a passenger in a car, and the car was heading southbound on Orange Prairie Road. The car went off the road. The driver was intoxicated at the time, and as he lost control of the vehicle going around a curb, he put his foot on the brake. He kept his foot on the brake, according to all police records and skid marks at the location of the road, but he was unable to keep himself on the road. He went off of the road, ran into what was the northern end post of a guardrail on Orange Prairie Road, did not get redirected back on the road, but rather crashed right through the very northern end post, and then went down into a ravine or an embankment, which all the evidence shows was over 30 feet deep and a steepness of about two and a half feet horizontal to every foot vertical. The evidence has shown in the record that we've produced that a guardrail, based upon Illinois Department of Transportation standards and AASHTO standards, that all experts in this case agree are authoritative, and municipalities and others who build roads are required to follow in Illinois, that a guardrail was required at that location, and in fact, based on those standards, as set forth in the briefs, that guardrail should have been extended an additional at least 60 feet north. It was not, and as a result, the car went into the end post rather than to the guardrail. We've produced expert evidence from an engineer, Mr. Sonalik, who has reviewed all of the IDOT and AASHTO standards, but also the testing standards for guardrails, and in exhaustive detail explained how, if that guardrail had been extended at least 26 feet further north, the car, when Mr. Wolf, the driver, lost partial control and braked, would have hit the guardrail, not the end post, would have been redirected back onto the road with his foot on the brake, and would never have gone off the road. As a result, the car would not have gone down into the ravine. The car would not have gone upside down. Mr. Gregory would not have suffered from head injuries and positional asphyxia, as reflected in the autopsy report, and he would not have died. So the claim here today, obviously the Wolf claim... I have a question about the, there is a, to the south of this wooden rail, there is a metal rail? There is, there was subsequent to the original building of this guardrail, and that is an issue that's actually very important in terms of looking at the facts of the case. But the original guardrail was made out of wood. The original guardrail had no metal, and the original guardrail was ended at that end post location where the accident occurred. There was some earlier dispute as to whether that was a guardrail, but the court found it to be, as a finding of fact. That's correct. Judge Vespa, who was the first trial judge to rule on plaintiff's third amended complaint, which are the allegations that are before you, which were the allegations before the second trial judge, Judge DeBicke, who granted a sober judgment against the plaintiff, all of those allegations, that was the complaint that was up at that time. But Judge Vespa had ruled on October 18th of 2010 that as a matter of law, this guardrail was a guardrail, i.e., that's a term of art, which means a roadside barrier used to shield motorists from natural or manmade obstacles located on either side of the traveled way. So that is an issue of fact that was never questioned, or that was a ruling that was never questioned by the city of Peoria, and that is the law of this case as we sit here today. The issue here comes down to the fact that the city of Peoria is being sued not as a designer of the guardrail, not as an installer, not as a constructor, but as a landowner who had a duty to maintain its property in a reasonably safe condition, and they breached that duty as a landowner because under the specific mandates of IDOT and AASHTO, they were required to have a guardrail there, and it was required to be a certain size and configuration, which included being extended an additional 60 feet north, which it was not, and that is the proximate cause. But for that, this car would have been redirected back on the road, and this death would not occur. They are a landowner, not an easement holder? Our understanding is they are the landowner of this property, and they had complete control over the property. And in fact, when you look in the facts that have been laid out, between 1995 and 2004, the city streets department was out at this specific location, and on at least two occasions they made modifications to this guardrail. The first modification, and we have limited evidence on this issue because even though we have requested documents and names of people who were involved in the first modification, we never received them, but the first modification occurred when a portion of this guardrail on the very southern end, which is away from where the accident occurred, the crash was on the northern end, for whatever reason, the decision was made to remove wood guardrail and replace it with metal guardrail. And I've enclosed documents that show how guardrails are to be constructed. This is an engineering decision that was made to do that. Who did it, exactly why they did it, whether they looked at the entire guardrail, which they should have based upon our expert's testimony, we don't know. But we don't know that because the documents were never produced. But the point is that they went out to this very guardrail, and they did that work. They also, according to, we have records for the second modification where they actually replaced wood rail along the wooden portions that remained. And that was in 1995, I believe, are the records from that. So we know, as a matter of fact, these are issues of fact here. We support this. Not that there was just that there was some nebulous duty on the part of the city to maintain and fix this guardrail, which they had under the IDOT and AASHTO standards, but that, in fact, they went out to this precise location. Mr. Hart, who was the superintendent of streets, testified that he, as part of his job, would drive the streets along with his personnel and check and see where things needed to be fixed or they were not properly done. And, in fact, here we have not just minor maintenance issues, but we have reconfiguration, new materials put in based on engineers' decisions to modify the south end. Why was the north end not modified? The answer to that is I don't know. But under the standard of care and under the IDOT standards, that northern end was required to be fixed, to be modified to comply with those IDOT standards. Now, the fundamental point... Is that repair on the south end comply with standards? Well, it complies in the sense that from the time that the guardrail was originally constructed in 77, 78, to the time that the modification was made, there was a trend towards using metal rather than wood. But there's nothing today that suggests that you can't use wood. In fact, in national parks, there's still wood guardrails that are used. So it was... I think there's nothing to say that there was anything improperly done by modifying that way, but the point was that the picture as a whole was not changed, that the configuration... Basically, what you're saying is that new standards, by lengthening the guardrail, needs to go further than possibly the standards in 1970. No, no. That's a point I need to make clear. When you look at the IDOT standards from 1969 and AASHTO standards from the same period, I think it's 1977, and both of those sets of standards were testified to by the city's own experts as being the authoritative standards that the city must follow. Mr. Hewitt, their engineer, testified to that, too. When you look at those standards, and my expert, Mr. Snell, is relying on those, based on those standards in place at that time, that guardrail had to be moved further north. And the later standards also support that, but support an even further extension. But what we're saying is, at a minimum, it should have been 60, even based on the 1977, 69 standards. But if it had just been extended 26 feet north, this accident would not have happened, the death would not have happened. The fundamental point, what happened here is that the third amendment complaint was allowed to be filed, which, in my opinion, eliminated any potential allegations that we were claiming that the city was involved in the original design or construction of the original guardrail, because we understood those to be barred by the MBA versus Enterprises case. And number two, there was no evidence, in any event, that the city was involved in the design or installation. So you're saying the 10-year doesn't apply. Correct, because what we're talking about is the failure of the city, as a landowner, not as an installer or designer or constructor, to fix a guardrail, as a property owner, to remedy a dangerous condition, when they had the duty, and it's not just some nebulous duty, when you look at the Snyder case and the Lococo case, which is a third district case, the duty of the landowner here with respect to the highway, they have to follow specific standards with respect to implementation of guardrails when they're putting in new streets slash highways. So their duty is created by these specific standards, and that's why we can get into the discussion, but that's why the tort immunities don't apply here in terms of discretionary immunity, because these standards tell them specifically what they have to do. There is no discretion. It's a ministerial act. But going back to MBA, the third amended complaint was the subject of a motion to dismiss filed by the city of Peoria, and it went before Judge Vespa, who has since retired, but he originally heard a motion to dismiss based on the application of the construction statute of repose, based on all the tort immunities that are before you on appeal, and based on the concept that plaintiffs have failed to prove proximate cause. Judge Vespa specifically denied all of those. The motion was denied that the complaint was allowed to stand. We were going towards trial. Judge Vespa retired. Judge Dubicki replaced Judge Vespa, and subsequent to that, the city of Peoria filed a motion for summary judgment on the same exact grounds. There was no additional fact... Alleging, though, that the facts were uncontested and they could prevail as a matter of law. That's correct. So that's the difference between what Judge Vespa decided. Could the complaint stand versus summary judgment? That's correct in terms of now you're looking technically at the facts, excuse me. But the point is that with respect to the statute... Isn't that what a motion for summary judgment requires? What are the contested or uncontested facts? Right, but in terms of the facts, Judge Dubicki concluded that we had, in fact, proven based on the facts that the tort immunities did not apply and that proximate cause should at least go to the jury. What he concluded, which knocked out the complaint and why we're here, is because he concluded as a matter of law that MBA Enterprises did not apply, essentially, to this claim. And that was a decision that he made as a matter of law. What he said is the facts, the one set of facts that he relied on, which I disagree with, is that the city was involved in the original design and construction of the guardrail. And therefore, because they were involved in the original design and construction of the guardrail, any claims against them are barred by the construction statute of repose. MBA Enterprises, which is a case Judge Dubicki relied on, I'm sorry, that Judge Vespa relied on, and Judge Dubicki did look at, if you look at that case carefully, it relates to the supply of gas. And there was a stopper nipple in a gas supply system that was defective and resulted in a major explosion. That stopper nipple had been constructed design well over ten years before the explosion in that case. And the plaintiff, the hotel owner I believe it was, sued that gas company for the original design and for maintenance, failing to maintain and fix the stopper nipple defect. What the court ruled was that all of the claims relating to the original installation and design of that defective stopper nipple are barred under the statute of repose. But that does not give the supplier and the inspector of the system, Carte Blanche, during the subsequent duty to maintain and keep that system safe. They're not saved from those claims because they have an ongoing duty to inspect and to fix. And what the court said, and Wright, which is a First District case, which actually rejected NBA, but what it understood NBA to say, and I think it's an absolutely correct interpretation of NBA, is that where you have a party that has a continuing duty to maintain a landowner or a supplier just because they're involved in the original design, and the original design involved a defect which was the cause of the injury, doesn't mean that they're immunized for the failure to identify or correct that design during the subsequent years when they had a duty to maintain and fix the system and keep the property reasonably safe. The point is, and I think it's a public policy argument, and I think NBA is right on point, and it's controlling law. Judge Dubicki had no right to reject NBA. He was absolutely required to follow it, and I don't think that any of his attempted distinctions have merit because here we had a defect in the guardrail back in 19... That defect is based on design that you contest, but that was addressed in the second amended complaint. And the statute of repose applied to that theory. So you reworded the third amended complaint to assert this new theory. Aren't you asking us to revisit the ruling on the second amended complaint? No, I'm asking because that third amended complaint, we were given leave to file that, and the judge concluded that that third amended complaint, Judge Vespa did, survived the construction statute of repose. He concluded that NBA Enterprises allowed those claims for negligent failure to maintain and fix that those survived the statute of repose. Judge Dubicki said because the city was involved in the original construction, which we disagree with based on the facts we put in, but even if we assume that to be true, Judge Dubicki said because they were involved in the original design and construction, that that gives them immunization from all claims relating to their failure to fix this defect, even when they went out to the guardrail and fixed other portions of it. Well, when they fixed the guardrail in 2002 by adding wood, how was that repair done in a defective way? When they went out to the guardrail, their duty was to comply with IDOT standards. The wood that they replaced in 2002, was it installed defectively? Well, there were two things that were done. The 2002, I'm not sure which one you're referring to, one time they went out and they replaced some wood rails, and one time they replaced wood with metal. They didn't replace wood with metal, they installed a separate guardrail that was metal, and positioned it closer to the roadway. I can see that perception of it. My view is that they went out to the guardrail and they made a substantive change to it. Our point is, when they went out to that, they had a duty to fix that guardrail to make it compliant with IDOT. Are you alleging what they did was done defectively? Yes, in the sense that their job was... They didn't modify it. They did not modify it. The actual work that they did, you're not claiming was done defectively. You're saying they should have ripped it out and started over. Or they should have extended it. They should have extended it further north. They had a duty to fix it to make it compliant with IDOT, which they did not do, and I know I just have a minute. It's also important to take into account the other argument that we're making that has nothing to do with the construction of statute of repose, is that they voluntarily undertook, assuming they didn't have the duty in the first place, which we said they did have the duty under the IDOT standards, that they voluntarily went out to that location, is the other argument, in 1995 and 2002, and undertook to modify that guardrail. When they did that, they had a duty to do it in the correct way, and they did not comply with IDOT standards. And in terms of what the scope of that duty was, in terms of whether they had a duty to fix the entire guardrail, number one, under IDOT standards, they did when they went out there, and number two, their argument that they didn't even think about the north side, they cannot prove that because they did not produce the records and they did not produce the expert who made the decision to do this work. They're seeking summary judgment. They have the burden of proof of showing what the scope of that duty was, and they haven't produced any of that material to reflect that. This is a drastic remedy. To simplify, you're saying under MDA, the judge deducting misread MDA? Absolutely. Okay, so that's really to simplify. For the statute of repose... You're relying on right out of the First District. As a summary, even though they rejected MDA, MDA is a Third District case, but you're saying Wright summarized MDA correctly. Even though it disagreed with it, I think it summarized it correctly. That's what I said, even though they rejected it. Right. And Wright, in the First District case, supports MDA, as have other cases. And I think it's the right public policy not to permanently immunize an installer when they also take on the second duty of being a maintainer or an inspector or a landowner who has a continuing duty to keep something safe. Thank you. Thank you. Mr. Fleming? Thank you, Justices. Counsel? Is that really the essence of this case, that the Dickey misread MDA? I don't think so at all. I think the essence of the case is what Judge Wright has put her finger on, and that is, is this specifically a focus on the design that was put in place in 1977 to 1979 only, or are they trying to claim true maintenance? Was there some bad maintenance done later? And she tried to ask counsel that directly, and I don't know the answer to it directly, but there is no maintenance that they are complaining of in the case. My view is this, Your Honor, is that all of the statute of repose cases support what was done at the trial court level on this case. About five of them, O'Brien, Wright, even Sitko, if you need to go that far, Gavin, and even MDA. I don't think that if you ignore the other cases and blindly follow MDA, you end up with the result of reversing. I don't think that at all. Let me tell you what I... I want to mention a couple things, if I can, about the facts what allegations are supported by the evidence in this case, which I think are important. All three complaints, and obviously the court has read them, all three complaints allege the exact same thing, and they focus on the design of the guardrail wasn't long enough. Wasn't long enough in 1977, wasn't long enough in 2002, wasn't long enough in 2004 when this unfortunate accident happened. Their expert says that one and only one thing, his only criticism of it is, should have been, one time he said 25 or 26 feet longer, another time 60 to 65, but let's say, should have been 60 to 65 feet longer. That's the only thing he says. He wiggles a little bit, maybe move it closer to the curb, but those are the complaints that he makes, those are the only thing that he supports, and both of those things were in place, exactly in place, in 1979 when this guardrail was completed and put in. We really need to go no farther than the brief of plaintiff, I think it's page 8, page 23, where they say that exact same thing, that that's the only criticism. And that's why it is important, I'm going to talk about statute of opposing in a minute, but that's why it's important to look at what is supported by the evidence rather than vaguely looking at what are the 9 or 10 allegations of the third amendment complaint. That he claims Judge Vespa allowed to proceed on a motion to dismiss, well obviously, because Judge Vespa doesn't have the evidence in front of him, he's not supposed to look at it at that point in time. Interestingly enough, all three judges that handled this case, Judge Brandt, Judge Vespa later, and ultimately Judge Bickey, addressed the statute of oppose and said the statute of oppose would apply. At some point in time they all did that, with Judge Bickey being the final ruling because he ruled on the third amendment complaint. Let me talk about... Oppose just goes to construction, doesn't it? It goes to design and construction. So putting it in in the first place. Yes, and choosing the design in the first place. Absolutely, Your Honor. And here's what I would say to this. If in fact their complaint was that when the three pieces of wood are replaced with metal at the southern end, if in fact when that's done, it's done negligently and the plaintiff's vehicle hits those and those are proved to be a proximate cause or a cause of the acts that are alleged to be, then he has a maintenance cause of action. I've got no statute of oppose claim on that. But the only thing we're talking about here, the only criticism from their expert is this needed to be from day one, needed to be 60 feet long in a design at the northern end. And that's what the case is talking about. That's why I kind of want to jump into these statute of oppose cases. That's what they talk about. And they say, O'Brien... So it is essence that you understand what the argument is. Once you mess with one end of that guardrail, you have to do the whole guardrail. He would like you to... That's his argument. I'm trying to simplify this case. He would like you to accept that. I do not think that the voluntary undertaking cases in the law in Illinois say that whatsoever. And V-E-S-E-Y is a case that addresses that very clearly. Now, here's what I want to talk about a little bit on what O'Brien and Wright... Wright, interestingly enough... I think they can spell it the same way. But in any event, the Wright case is this. It may sound simple, but the logic and the reasoning and the analysis of Wright are on point in this case. That's the one with that little step in front of... I believe it to be... Yes, the little step in front of the old building. It's a 1965 step. And from day one, that step was wrong. It violated Chicago municipal code, violated the premises liability act, because you're supposed to have a scoop there, bigger and wider and different shape, instead of a step. And they addressed whether a claim later, whether there's a maintenance, is an ongoing duty to change that, to change things. And that Wright court said, no, absolutely not. If you're talking about the original design, that's what the statute of repose applies to. Maintenance would be if you, during the course of maintenance, did something wrong later, and someone's suing you for that exact... Well, that's why they rejected MBA, right? I'm not so sure that Wright had to reject... Wasn't that the same case he was talking about? He was talking about Wright and O'Brien. And they did not have to reject MBA outright. Frankly, Your Honor, the only case that rejects MBA outright, without even further thought, is that Sitko case. Because, interestingly enough, it's a piping case. So they say, well, frankly, we need to hit it head-on, and they're rejecting MBA. I say that it fits very logically with the law. O'Brien, Wright, this light pole case is interesting, too. The Gavin case, it's just like the step. Gavin has a traffic light standard that's in the wrong place from day one. Like, it's a 1966, I think, light pole, and it violates all the standards. It's in the wrong place. And Gavin says, if it's the original design, the statute of repose protects all the entities thereafter from liability for that. And, Your Honor, MBA says the same thing. I have respect. I'm going to tell you, I have respect for the MBA case because it's talking about highly toxic... gases, and dangerous gases. And, yes, we need to be protected. We, as citizens of Illinois, kind of step out of my role as a lawyer and advocate for a minute, we need to be protected from that. But what MBA says this. MBA says, it's directly from their quote, we find that plaintiff's claims regarding design and installation are time-barred. They do that. That's what the law is. And that's all we're asking you to continue to do in this case and that the trial court did three times. What MBA did is go a little farther and say, hey, the hazardous gas company is involved in the sale, too. They said there are two specific claims here. One's for negligent design, and the other one is for sale. And they find a way to say, well, you're selling gas, you have a duty regarding selling gas. And that is much, much different than what we have here. And I think in the O'Brien case, the Wright case, I just really think that step case just simplifies and addresses the issues here very clearly. O'Brien, I want to say this. So the duty of selling gas? Yeah, that's the way they do it. That's the way they talk about it. And there's a good public policy behind it, Your Honor. Judge Dubicki focuses on the fact that it's an inert object. The guardrail is an inert object, just like the step was an inert object. But where a duty arises is when the city or the agency is delivering a service by using other equipment that has to be maintained. That's the distinction here. There's not a service involved here. There's an inert object. Yes, Your Honor. And the cases can be distinguished, and I think in Wright they distinguished the, I want to say MBA case, but they distinguished it. They didn't... Right, they addressed it and distinguished it. They didn't ignore it. They did not ignore it. So there's not a good public policy to continue and have safe roadways, guardrails that are adequate? Well, in a kind of an esoteric statement, everybody would say that, Your Honor. But what there is not under the law is an ongoing duty to continue to change and update and change and update. An inert object. Yes, yes. And I have a... This is what O'Brien says to that public policy. I'd have to find the actual page within the brackets here. 874 is what it says. O'Brien contends the voluntary assumption rule should be studied traffic patterns and generally maintaining the roads. The court says, but if these actions form the basis for a voluntary undertaking, every municipality that repaired roads within its jurisdiction would face liability for accidents, and they might refrain from even doing minor repairs by going on to do that. Obviously the line needs to be drawn, and the public policies balance and compete. The statute of repose is part of our legislative framework here, and, frankly, these cases, I think, all follow it, and our case fits directly within that. Do you think that there's a difference? Because not only was there work done at the south end, but that there was also work, repair, maintenance done to this end as well, once to just replace the wood, and then once to, I think, I don't know if they added a new rail in front of, or did something else, and they put something metal in at this end as well. These are the two things that happened over time. One is that replacement of wood with wood somewhere in the 300 feet or so. We don't know what location. And the other one is replacement of three pieces of wood with three pieces of metal at the southern end that you can see very clearly in the photographs. Those are the two things. Those are the two things they did over time. But our position is, and the case law supports that, if you do those, do those correctly and do those non-negligently, but the law says then you don't have suddenly a duty to then go ahead and recreate and redesign the whole thing. That repair you could be liable for. We could be liable. As a landowner. Yes. That's the basis of the Third Amendment complaint. The landowner failed to maintain properly. And if I understand counsel's somewhat evasive answer, he can't tell me how they failed to repair correctly, but he wants to bootstrap it back to in order to repair, he had to redesign. And there is no case that says that. Correct. Correct. Correct. I would like to move forward to a different issue, if I may, to get off this statute of repose for just a minute, because there's another issue that I think is very, very strong in this case that is part of the briefs, and that is this proximate cause issue, if I may move forward to that. The Bernabé case, the DiBenedetto case, and I think it's Hull, H-U-L-L, those three cases talk about, and they're all barrier-type cases, failure to have barriers or fail to extend a barrier. And the courts there say, even if you put the statute of repose aside for just a moment, that if the vehicle driver loses control and that causes someone to go off the roadway, that cuts the proximate cause off. Because the case will talk about this, somewhere along the line, they are going to run into a ditch, a tree, something over there, and something bad is going to happen because they've left the roadway. The roadway is where it's intended for vehicles to be, and that's where the duties are. And these cases talk about, and frankly, I am even surprised myself how strong the language in those cases are. It absolutely says loss of control. Did the court allow summary judgment based on proximate cause? In this case, the court did not. Granted on that. It was not... So why are you asking us to address it? Was there a cross-review? No, absolutely not, Your Honor. I probably should have said this first. This court may support, uphold the trial court's summary judgment on any basis that it finds proper in the record. You may find summary judgment was proper on any basis you find in the record that is valid. And I'm saying to you, it was raised as our motion in the trial court, and it's raised in our briefs, and there's evidence that supports it. And what did the court do with your motion on that ground in the trial court? The Judge DeBicke denied... I can read it. I don't know if he denied on all Tort Immunity Act grounds or if he denied on all other grounds. Let me read that real quick. So just as a procedural matter, I'm troubled by that argument because there is a cross-appeal here, and if we affirm on the statute of repose, and who knows if that will happen or not, why even look at that issue? You don't need to touch it. You don't need to get there. If the statute of repose resolves this issue, you do not need to get to that. I do see Judge DeBicke says all other bases are denied. Summary judgment on all other bases are denied. So there's no question. And I'm just wondering, you didn't cross-appeal, so why do we have to search the record to justify? Aren't you saying that in the event that we found that the statute of repose did not bar that this would? Yes. That we could affirm on this basis. That's what I'm saying. I understand that. So now what you're saying is this case law about proximate cause that when a motorist leaves the roadway, okay? Am I correct? It actually, the language is this, loses control. Loses control. And leaves the roadway. Any proximate cause on a failure to protect that motorist off the intended area is broken. The chain is broken. And why are we spending millions of dollars on guardrails? Well, I suppose the point is we cover it up. I'm just asking. I know. The state's broke. And you know what? Interestingly enough, Your Honor, they are changing from guardrails. Now there's even new, more modern technology doing different things with wires and types of things. Things change. Well, they haven't out in front of my place. Spent a million dollars and 36 miles putting new guardrails up. Counselor, your point is all to keep you safe, Justice Fulbridge. All to keep you safe. But what guardrail is going to keep somebody going 107 miles an hour while intoxicated? That's an excellent question. There's a big elephant in this room and nobody's talking about it. That's an excellent question. And I think what I'm just doing is I'm addressing the issues that are up and you make an excellent point. That having been said, I'm not going to spend a lot of time talking about the other bases that you ordered me into the act. Those are other grounds that could be used, if needed, to support the summary judgment. And I will not spend any further time arguing those. If there are no more questions, I thank you, all three. Mr. Bonebrake. Just to address the proximity clause issue briefly, we spent painstaking efforts with respect to our experts explaining exactly how a vehicle going 100 miles an hour with a drunk driver would survive this accident using the tracks that are on the ground, the length of the guardrail, the strength of the guardrail, the fact that there was a six-degree angle contact, which means it's a very slight hit. And it's all painstakingly detailed in the disclosure of Mr. Sinalik. And respectfully, I believe that at a minimum, it creates an issue of fact. And Judge Zubik, you agree with us on that point. Going back now to the area that I think you felt I was being evasive, and I want to address that for a second. This is from the case Wright v. Board of Education. This is a specific quote, and it's talking about MBA. The other approach taken by Illinois courts is that even after the 10-year statutory period, a party who is in a position to correct a design defect loses the protection of Section 13214 to correct a design defect. And I think we're getting into semantical arguments here. Correcting a design defect could be fixing a rail. It could be fixing – it could be extending the rail further north. That is, in my opinion, it's maintenance, it's fixing, it's making it operational. You could call it redesigning, but it's fixing. And correcting a design defect is fixing. The stopper nipple in the MBA case, once again, that stopper nipple that caused that explosion, nothing was done to that stopper nipple for 25 years, and yet the court found that the supplier was not immunized, even though it installed that stopper nipple 25 years before, because it had a continuing duty to inspect, and it should have caught that defect. The defect is in the stopper nipple, which is inert. A guardrail is inert. Gas is not inert. It's an incredibly dangerous instrumentality, and because that inert object was not fixed, we had an explosion and death. The guardrail is inert. Cars are not inert. And if that guardrail doesn't work, we're going to have a death. It is virtually analogous. Electricity, the case of – there was a First District case, Ryan. They used the same argument at Ryan to find a duty, that the installer is not permanently immunized if it has a continuing duty to maintain, because that is an incredibly dangerous thing to do. That's not the purpose of 132-14, to permanently immunize somebody who has a duty to inspect and to fix. I cannot see any distinctions between these different entities because they're all extremely dangerous instrumentalities. They require continuous maintenance, unlike a step. We have to have the cities going out and inspecting these areas. They're required to do it. The city admits that it's done it. They went out to this very guardrail twice, and they're required under the IDOT standards and AASHTO standards since 1977 to have put this up the right way, which they did not do. And their experts don't even evaluate what the IDOT standards say. They just say there's no guardrail out there at all. It was just a wood rail, which the evidence shows is not true. And, in fact, they went out there and they fixed it. But we're not going to revisit that issue. Okay. But the point is, fundamentally, MBA has the right policy, and I believe it's an analogous situation here in terms of the dangerous instrumentalities that are involved. Do we want to be in a position where just because an architect or a contractor builds something defectively but then has a continuing duty to maintain it? Remember, they don't have to contract to maintain this for the next 15 years. There are plenty of people that would just build it, and that would be it. If that's all they do, the construction statute protects them. Thank you. But if they contract to have a continuing duty, or if they're a landowner, like a city, which has a duty to keep safe roads, if they have that continuing duty, why should they be immunized under 13214 permanently? The policy that you would create is the city to say, you know, there may be problems here with these designs, but if we identify something that needs to be fixed, then we don't have to worry about fixing it because we've got permanent immunity under 13-214. So we have no duty to inspect at all. If somebody says that we failed to identify something, we can just go back to the fact that we originally designed and installed it. And that brings me to my final point. If you look at the evidence, I respectfully believe that Judge Dubicki was incorrect. The city was never involved in the original design and installation. If you take a look at Mr. Hewitt's deposition testimony, which is in the appendix, and is discussed in my brief, it's clear that the city did not do the design and install. It was Mr. Zumwalt, an architect, who did that, and Poly Construction, who constructed it. The city merely approved it and paid for it, just like a homeowner would pay for an architect to do it. And Mr. Hewitt admits that it was all the design of Mr. Zumwalt, an independent architect. So there's no application of 13-214 at all in this case. But if you assume there is, and if you believe Judge Dubicki is right, based on looking at the evidence, that the city was involved in the original design, it does not immunize them to the actions. How does that point affect the third amended complaint? You keep losing me there. That goes to the second amended complaint, which was dismissed, or not dismissed, but the statute of reclose applied to. Judge Dubicki believed that the way the third amended complaint was alleged, that it implicated the... He didn't allege that the fact that the city did or did not design it has no application to whether they had a duty as a homeowner. As a landowner, yeah. Well, what he believed... As a landowner, excuse me. What he believed... Your theory in the third amended complaint is what we're going to look at, and your theory has nothing to do with the original design. That's correct, but his point was, because, in his mind, the crucial point was, was the city involved in the original design? He asked for facts, specifically on that question, because if they were involved in the original design, then they were permanently immunized, regardless of what they did subsequent to that. So he focused on the motion for summary judgment that Mr. Fleming filed. He asked us to file supplemental briefs relating to whether the city was actually involved in the original design or construction at all. And we provided a ton of information about that, which he disagreed with and said, no, when I look at it, I think they were involved, and since they were involved, that means they're permanently immunized all the way up to 2004. That was his opinion, which, in my opinion, directly opposed MBA, which he had no authority to do, because it was third district binding precedent. Thank you. Thank you very much. We will be taking a brief recess for a panel change and taking this matter under review.